IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| CHANCE EDWARD BLACK, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Civil Action File No. |
| | : | 7:06-CV-75 (HL) |
| JAMES CAMON, Superintendent, et. al, | : | |
| | : | |
| Defendants. | : | |
| | : | |

_____

**RECOMMENDATION**

Presently pending in this *pro se* 42 U.S.C. §1983 action is a motion for summary judgment filed by the last remaining defendant, James Camon who at all times relevant to this lawsuit was the Superintendent of Patton Probation Detention Center.  (Doc. 62).

On or about August 11, 2006, plaintiff, at the time an inmate at the Robert L. Patten Probation Detention Center, filed his initial § 1983 complaint in this action. Due to the length of the initial complaint, and the fact that the unrelated claims involved two different institutions of confinement, the undersigned ordered the plaintiff to recast his complaint. On October 13, 2006, plaintiff filed his Recast Complaint, naming as defendants only those officials employed at the Robert L. Patten Probation Detention Center.

The only claims that remain pending in this action are plaintiff's claim that he was denied books, magazines, and other publications, and that defendant forced plaintiff to attend a religious ceremony and thereby infringed upon plaintiff's religious rights.  According to plaintiff's original complaint (Doc 2) he arrived at Patton Detention Center on October 19, 2005, and was due to be

released at the expiration of his sentence on August 9, 2006. The original complaint was signed on August 8, 2006 and stamped filed on August 11, 2006.

In determining a summary judgment motion, the inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.*, 951 F.2d 1235 (11th Cir. 1992)(citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp*., 475 U.S. 574 (1986). However, once the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

When the nonmoving party has the burden of proof at trial, the moving party may carry its burden at summary judgment either by presenting evidence negating an essential element of the nonmoving party's claim, or by pointing to specific portions of the record which demonstrate that the nonmoving party cannot meet its burden of proof at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606-608 (11th Cir. 1991).

The existence of material disputed facts will not defeat summary judgment in favor of a public official, however, when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [plaintiff's] case, and on which [plaintiff] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23, 106 S.Ct. at 2552. Thus, under such circumstances, the

public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

### *Denial of Publications*

In his original and amended complaints, the Plaintiff states upon his arrival at the detention center on October 19, 2005, he "was advised that he could not and would not be able to receive or keep any publications in this facility." Plaintiff appears to claim that after filing a grievance on such matter, he was eventually informed by a staff member, Ms. Collins, that the detention center "does not accept books in the form of packages...career related or otherwise." Plaintiff alleges that he continued to unsuccessfully request publications.

Defendant Camon states that Plaintiff's arrived at the detention center with approximately 41 magazines and 4 different magazine subscriptions each month. (Exhibit F Aff. Camon, Doc. 64).

According to Standard Operating Procedure IIB04-0001, Part VI, Section C, para 4: "An inmate/probationer shall be limited by the personal property (SOP IIB06-0001) on how many books, magazines, printed material or photocopies he or she may keep in his or her cell or dormitory." In this regard, SOP IIB06-0001, VI, Section C, paragraph 11 provides further that the "Wardens at individual institutions have the discretion of limiting the quantity of personal property items to be received in packages, or excluding specific items, depending on the security, sanitation, and fire safety requirements at that institution." Moreover, Rule 125-3-3-.04 provides that the Warden/Superintendent may establish a specific limit upon the number of publications admissible per inmate, consistent with the accommodations available at the institution and that "[d]uplication of publications reasonably available through institutional library facilities may be restricted because of space or fire hazard considerations." (Exhibits A, B, and C, Doc. 64).

As a result of such Standard Operating Procedure and Rule, Defendant Superintendent Camon informed Plaintiff in response to grievance no. 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 that "Due to the limited space and short-term sentence and [Camon's] concern for fire safety, packages, magazine subscriptions, newspapers, etc., will not be tolerated." (Exhibit D, Doc. 64).

Georgia Department of Corrections Rule 125-3-3-.04 provides that "inmates may receive a limited number of individual books, periodicals, or newspapers." This Rule further provides that "membership in bookclubs or similar enterprises may be restricted on a case by case basis due to inadequate inmate funds, space limitations, or safety requirements. Each Warden/Superintendent may establish a specific limit upon the number of publications admissible per inmate, consistent with the accommodations available at his institution. Duplication of publications reasonably available through institutional library facilities may be restricted because of space or fire hazard considerations." (Exh. C Doc. 64).  Pursuant to these regulations, Defendant Camon determined that due to limited space and fire safety concerns, magazine subscriptions and newspapers would not be allowed in detainees' cells.  (Exhibit F. Camon Aff. Doc. 64)

The Supreme Court of the United States acknowledged that a difference existed between disputing facts and disputing a prison official's professional judgment. *Overton v. Bazzetta*, 539 U.S. 126, (2003). The Court further asserted that regarding such professional judgment, that courts' "inference must accord deference to the views of prison authorities." *Beard v. Banks*, 548 U.S. 521, 530 (2006). Thus, the Court reasoned that "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Id.*

The Court also recognized that the exercise of professional judgment would not constitute

4

carte blanche freedom to deprive prisoners of all their constitutional protections, but inherently, the Constitution does allow "greater restriction of such rights in a prison than it would allow elsewhere." *Id.* at 528, *citing Turner v. Safley*, 482 U.S. 78, 93 (1987). Thus, the Court held that "restrictive, prison regulations are permissible if they are 'reasonably related' to legitimate penological interests."   The four factors of the *Turner* analysis are first, whether there exists a "valid, rational connection" between the prison regulation and its justification as articulated by the prison official; second, whether there are "alternative means of exercising the right that remain open to prison inmates;" third, how will accommodating the asserted constitutional right impact the guards, other inmates, and available prison resources; and four, whether there are "ready alternatives" to the prison policy that further the named penological interest. *Id.* at 529, quoting *Turner* at 90.

As stated by defendant, he restricted the number of books and magazines the plaintiff may keep in his cell in order to protect not only the plaintiff and the detainees housed in the Robert L. Patten Probation Detention Center but also the facility itself from fire hazards.  from smoking during the program, which is normally allowed in the outside areas.  (Exh. F Camon Aff. Doc. 64).

The Plaintiff arrived at the Robert L. Patten Probation Detention Center with an already considerable collection of paper documents, so the continuing receipt of his magazine subscriptions would have greatly increased the amount of highly flammable paper kept in his cell.   Defendant Camon found that limited space at the facility necessitated a restriction of the receipt of personal periodicals for all of the inmates. (Exh. F Camon Aff. Doc. 64).   Therefore, the undersigned finds that defendant has shown that the restriction is reasonably related to a legitimate penological interest.

As stated by defendant, plaintiff had an alternative means to periodicals by having access to the

Detention Center's library facilities, which contained periodicals for use by all of the inmates. While admittedly going to the library is not nearly as convenient for the Plaintiff as having the materials available to him in his own cell, he did still have access to the same or similar information.   The Plaintiff thus has an alternative means by which to peruse periodicals.

Accommodating plaintiff's request to continue the high number of periodicals he was receiving, thereby allowing detainees unfettered access to paper material, puts the lives of the detainees, the safety of the guards, and the security of the overall detention facility at risk. Allowing books and papers to pile up in the cells affords detainees the opportunity to create hiding places for fabricated weapons or other contraband and thus puts the guard staff at even greater risk when their duties call for them to enter these cells.      (Exh. F Camon Aff. Doc. 64) Such additional hiding spaces for contraband and weapons could also jeopardize the safety and lives of other detainees as undiscovered weapons will just likely be turned on fellow detainees as guards. Additional access to contraband items promotes discord amongst detainees who fight over these items.   Furthermore, the build up of paper items in a facility where detainees have access to cigarettes poses an increased risk of fire.   (Exh. F Camon Aff. Doc. 64).

Defendant Camon further states that the facility in question is a detention center rather than a full-fledged correctional facility, meaning that its detainees are confined for only short-duration sentences. In fact, plaintiff's own stay at the detention center was slightly less than ten months, according to his own complaint.

As argued by defendant, there are no "ready alternatives" that further the named penological interest. *Turner, supra* at 90.  Allowing all of the detainees to have unfettered access to personal periodical subscriptions would result in the need for more space for storage, which the facility does

6

not have, or more guards and other staff to manage the amount of paper the periodicals would create.

The undersigned notes that plaintiff's stay was slightly less than ten months according to his own complaint. And although plaintiff argues that he received the periodicals at other institutions, that does not mean that defendant Camon exercised his judgment in an inappropriate manner. Further, plaintiff does not claim that the restriction was only for him; Defendant Camon states that all detainees are subject to the restriction on personal periodicals. (Exh. F Camon Aff. Doc. 64). Further, plaintiff does not state that the periodicals to which he had subscriptions were not available in the library at the detention center.

Defendant Camon has met his burden for summary judgment as to the issue of the denial of periodicals. Plaintiff has failed to adequately counter the evidence and argument submitted by defendant.

### *Religious Infringement*

Plaintiff alleges in his recast complaint that on December 22, 2005, "Superintendent James Camon and Assistant Superintendent Moses Daniels ordered all detainees outside to attend a religious ceremony." This ceremony was alleged to have occurred in the outside recreation yard. Plaintiff claimed that as part of the religious ceremony, a choir sang, a sermon was preached and that Defendant Camon also preached a message "in an attempt to persuade all inmates to accept Christ as their Savior.

The Establishment Clause, which applies to the states through the Fourteenth Amendment, provides that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. Amend. I; *Everson v. Bd. of Educ.*, 330 U.S. 1, 15, 67, 67 S.Ct. 504, 91 L.Ed. 711 S. Court. 504, 511, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711

(1947). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244, 102 S. Court. 1673, 1683, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). "

The Establishment Clause " 'mandates governmental neutrality between religion and religion, and between religion and nonreligion.' " *McCreary County, Ky. v. ACLU*, 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)). "The Establishment Clause applies not only to state statutes, but acts and decisions of individual government actors ..." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1284 (11th Cir.2004).

The case of *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987),  involved a Muslim prisoner who was assigned to work outside the prison, but who wanted to be brought back inside the prison at noon on Fridays so that he could attend the congregational prayer required of him, known as Jumu'ah. 482 U.S. at 345-346, 107 S.Ct. at 2402-2403. The Court held that while prisoners retain First Amendment rights, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." 482 U.S. at 348, 107 S.Ct. at 2404, quoting *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). The Court stated:

> In considering the appropriate balance of these factors, we have often said that evaluation of penological objectives is committed to the considered judgment of prison administrators, "who are actually charged with and trained in the running of the particular institution under examination." To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. We recently restated the proper standard: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." This approach ensures the ability of corrections

8

officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration," and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to "resolution by decree."

482 U.S. at 349-350, 107 S.Ct. at 2404-2405 (citations, including Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and footnotes omitted).

In considering the appropriate balance of these factors,  evaluation of penological objectives is committed to the considered judgment of prison administrators, "who are actually charged with and trained in the running of the particular institution under examination." *Bell v. Wolfish*,  441 U.S. 520, 562 (1979).  To ensure that courts afford appropriate deference to prison officials, the Supreme Court has determined that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.... "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, supra, 482 U.S., at 89, 107 S.Ct., at 2261. This approach ensures the ability of corrections officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration," *id.,* and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to "resolution by decree." ...*Id.*

According to defendant, detainees were not required to participate in the religious aspect of the program, but due to the limitations of the Detention Center's resources, the detainees could not be split into multiple groups.  Additionally, the Detention Center's administrative staff had a responsibility to ensure the safety of the speaker, which it could not provide had they divided the detainees into various different groups.   (Exh. F Camon Aff. Doc. 64).

9

In an effort to accommodate inmates' rights to free expression of religion, the detention center

routinely offers various religious programs for the inhabitants to attend.  The program in question

took place on the 22nd of December, only a few days from Christmas, a significant holiday celebrated

by Christians.  Defendant states that  Bible verses and songs such as those alleged by Plaintiff would

therefore have been appropriate for a Christmas program, and due to the fact that Christianity was

the dominant religion to which detainees at the detention center adhere, Superintendent Camon

determined that holding the program outside on the recreation yard was the most expedient means

for granting the large number of detainees interested in such a program access to it without incurring

unreasonable costs.  (Exh. F Camon Aff. Doc. 64).

The program in question took place in the detention center's recreation yard on the basketball

court.  Other spaces were made available where detainees were allowed to ignore the program or

otherwise not participate; detainees not choosing to participate were merely prevented from

interrupting the others, who had chosen to practice their religion, and to refrain

from smoking during the program, which is normally allowed in the outside areas.  (Exh. F Camon

Aff. Doc. 64).

First, although it is undisputed that Plaintiff was exposed to the Christian worship services and

prayer as alleged, Plaintiff's exposure on those occasions had a valid, rational connection to the

legitimate government interest of managing and securing the prison while accommodating the

religious rights of another group of prison inmates, those practicing Christianity. Second, although

Plaintiff argues that he has a right to complete non-exposure to other religions,  the Supreme Court

recognized in *O'Lone* that a inmate's stringent religious requirements can "make it extraordinarily

difficult for prison officials to assure" that his particular belief can be accommodated. Id., 482 U.S.

at 351. In *O'Lone,* the court stated: "While we in no way minimize the central importance of Jumu'ah [a weekly Muslim congregational service] to respondents, we are unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end." *Id.* at 351-52. The court considered, instead, whether the inmates retained "the ability to participate in other Muslim religious ceremonies," stating: "[t]he record establishes that respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations." *Id.*

Plaintiff does not allege that he has been deprived of any form of religious exercise of whatever religion he wishes to practice, or freedom from practice of any religion, except freedom from exposure to other religions. The ability of Plaintiff "to participate in other religious observances of [his] faith supports the conclusion that the restrictions at issue here were reasonable." Id.

Third, considering the impact that accommodation of Plaintiff's asserted right to be completely free from exposure to any other religion would have on other inmates, on prison personnel, and on allocation of prison resources generally, the undersigned is satisfied  that the burden of such an undertaking would be unduly onerous, if even possible. Indeed, considering the final prong of the reasonableness analysis, Plaintiff has made no suggestion as to how his assertion of  complete non-exposure to other religions could be accommodated at a *de minimis* cost. *Overton*, *supra,* 539 U.S. at 136). "The burden ... is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton*, *supra*, 539 U.S. at 132. This Plaintiff has failed to do so.

As the Supreme Court stated in *O'Lone,* "[w]e take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to 'substitute our judgment on ... difficult and sensitive matters of institutional administration,' ... for the determinations of those charged with the

11

formidable task of running a prison." *Id.*, 482 U.S. at 353 (citations omitted). The policy alleged to infringe Plaintiff's constitutional rights in the present action is reasonable under the *Turner* analysis and, thus, does not offend the Free Exercise Clause of the First Amendment to the United States Constitution.

Furthermore, in *Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1971), the Supreme Court set forth three factors for use in determining whether a challenged practice is permissible under the Establishment Clause. A state action violates the Establishment Clause if: (1) it does not have a secular purpose; (2) its primary effect is to advance or inhibit religion; or (3) it fosters an excessive entanglement with religion.

Plaintiff's allegations fail the *Lemon* test. First, as discussed above, Plaintiff's confinement in the exercise yard during a Christian worship services served a secular purpose: it facilitated the management and security of the prison during services accommodating the religious rights of the Christian inmate population. (Exh. F Camon Aff. Doc. 64).

Second, Defendant's actions on these occasions neither advanced nor inhibited religion but, rather, facilitated prison management and security during the events. Plaintiff does not allege that he was forced to pray, worship, or even pay attention to any of the challenged events. Indeed, at the worship services conducted on the exercise yard, the inmates were free to do as they pleased, as long as they did not disrupt the service or smoke.

"Accommodating religious practices that does not amount to an endorsement is not a violation of the Establishment Clause." *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 976 (9th Cir.2004) (citing *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987) ("This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause.").

12

Finally, Plaintiff's allegations do not support an inference of excessive government entanglement with Christianity or an institutional preference for Christianity. Although Plaintiff alleges that Defendant openly advocated a personal preference for Christianity and invited the inmates to accept Christ as their savior, Defendant also states that inmates were free to participate or not as they chose, and that every inmate was required to be on the yard for security reasons." (Exh. F Camon Aff. Doc. 64). Whatever Defendant's personal religious beliefs, there is no evidence of an institutional preference for, or entanglement with, Christianity, merely an attempt to accommodate the rights of the majority of the inmates at the institution to practice their religion. Therefore, there is no violation of the Establishment Clause.

Therefore, it is the RECOMMENDATION of the undersigned that defendant's motion for summary judgment  be **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may file written objections to this recommendation with the Honorable Hugh Lawson, United States District Judge, WITHIN FOURTEEN (14) DAYS of receipt thereof.

**SO RECOMMENDED**, this 9th  day of February,  2010.

> **S/ G. MALLON FAIRCLOTH**
> **UNITED STATES MAGISTRATE JUDGE**

msd

13